**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| SHARON LEE, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:10-CV-155-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| **Commissioner of Social Security,** § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the District Court's *Order of Reassignment*, dated July 6, 2010, this case has been transferred for all further proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c). Before the Court are *Plaintiff's Motion for Summary Judgment*, filed May 28, 2010, and *Defendant's Motion for Summary Judgment*, filed June 25, 2010. Based on the relevant filings, evidence and applicable law, Plaintiff's motion is **GRANTED**, Defendants's motion is **DENIED**, and the case is **REMANDED** to the Commissioner.

### I. BACKGROUND[1]

**A.    Procedural History**

Plaintiff Sharon Lee ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and XVI of the Social Security Act. On June 14, 2007, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability since January 1,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

2005, due to anxiety, depression, joint pains, blurred vision, stomach pain, headaches, and obsessive compulsive disorder. (Tr. at 9, 102-13, 142, 164.) Her application was denied initially and upon reconsideration. (Tr. at 45-48.) She timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 66-67.) She personally appeared and testified at a hearing on February 19, 2009. (Tr. at 19-20.) On May 11, 2009, the ALJ issued a decision finding Plaintiff not disabled. (Tr. at 9-18.) Plaintiff then requested the Appeals Council to review the ALJ's decision in light of newly submitted medical evidence. (Tr. at 4-5.) The Appeals Council denied her request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 1-4.) On January 28, 2010, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on November 15, 1968; she was 36 years old at the time of alleged onset date of disability and 40 at the time of the hearing. (Tr. at 102.) She has a GED and has received office skills training and vocational training as a nursing aid and pharmacy technician. (Tr. at 24, 147.) Her past relevant work includes jobs as a home health attendant and tax clerk. (Tr. at 16.)

    **2.     Medical Evidence**

In 2004, Plaintiff was diagnosed with anxiety and clinical depression, and she was prescribed medication for her anxiety. (184, 195, 251, 277-79, 317). From January to May of 2005, Plaintiff was treated for anxiety and depression. (Tr. at 237, 240, 275, 280, 328.) On June 22, 2007, Jagan Reddy, M.D., a psychiatrist at the Dallas Metrocare, saw Plaintiff for an initial psychiatric assessment. (Tr. at 346-50.) Plaintiff reported that she had been suffering from anxiety for over

fifteen years, but more so for the past two years. (Tr. at 347.) Dr. Reddy noted that she was adequately groomed, cooperative, alert, and oriented, and had an organized thought process, intact memory, normal attention, and good insight, judgment, and impulse control. (*Id.*) He diagnosed her with major depressive disorder, recurrent, moderate ("MDD"), obsessive compulsive disorder ("OCD"), and anxiety disorder, and he prescribed Xanax and Luvox. (Tr. at 347-48.)

On August 16, 2007, James Lawrence Muirhead, Ph.D., conducted a consultative psychological evaluation of Plaintiff. (Tr. at 353.) He noted that she was taking Alprazolam once a week to manage her anxiety and had discontinued Luvox after experiencing side effects. (*Id.*) He diagnosed her with OCD and mixed substance abuse. (Tr. at 355.) Dr. Muirhead assigned her a global assessment of functioning ("GAF") score[2] of 65, noting that she exhibited a sense of humor, laughed on several occasions, and had no difficulty remaining on topic, and that her thought processes were relevant and goal directed. (*Id.*) On August 31, 2007, John Ferguson, Ph.D., another consultative examiner, completed a psychiatric review form for Plaintiff and similarly diagnosed her with OCD and mixed substance abuse. (Tr. at 356, 361, 364.) He noted that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation. (Tr. at 366.)

Dr. Ferguson also completed a mental residual functioning capacity ("RFC') assessment of Plaintiff and noted that she was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete

---

[2] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (DSM-IV).

a normal workday and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (Tr. at 370-71.) He explained that Plaintiff was "able to understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes." (Tr. at 372.)

From July to October of 2007, Plaintiff continued seeing Dr. Reddy, who noted in a letter dated September 20, 2007, that he had prescribed Xanax and Luvox for MDD. (Tr. at 376-93).

On November 19, 2007, another consultative examiner Susan Thompson, M.D., issued a psychiatric review form for Plaintiff and noted MDD, OCD, and polysubstance abuse as her medically determinable impairments. (Tr. at 394, 397, 399, 402.) She found that Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining concentration, persistence, or pace, moderate difficulties in maintaining social functioning, and one or two extended episodes of extended duration. (Tr. at 404.) The same day, Dr. Thompson also completed a mental RFC assessment of Plaintiff. (Tr. at 408). She noted several moderate limitations and concluded that Plaintiff could "understand, remember, and carry out detailed instructions, make decisions, attend and concentrate, accept instructions, and respond to changes in a work setting." (Tr. at 410.)

Plaintiff continued visiting Dr. Reddy during the next two months. (Tr. at 413-20.) She complained of difficulty sleeping, sadness, increase in appetite, limited concentration, low self-esteem, fatigue, and restlessness. (Tr. at 417.) In a letter dated January 22, 2008, Dr. Reddy summarized Plaintiff's diagnosis as MDD, OCD, and anxiety disorder, and stated that she was taking Xanax and Cymbalta. (Tr. at 444.) He also stated that "she had a difficult time with people entering her home at any time." (*Id.*) He expressed his hope that with continued medical treatment her condition might improve. (*Id.*)

On May 6, 2008, a physician at the Parkland Hospital noted that Plaintiff had been recently assaulted and had a difficult time staying at the apartment where it occurred. (Tr. at 449.) On November 25, 2008, Dr. Reddy submitted an assessment to the Department of Health Services ("DHS") stating that Plaintiff was unable to work at all due to her MDD, but that her disability was not permanent and was expected to last six months or less. (Tr. at 446.) On April 16, 2009, Afshin Gutierrez, MSN, PMHNP-BC, submitted an updated assessment to the DHS stating that Plaintiff was unable to work at all due to her MDD and OCD, and that her disability, though not permanent, was expected to last more than six months. (Tr. at 512.)

### 3. Hearing Testimony

Plaintiff and a vocational expert ("VE") testified at the hearing before the ALJ. (Tr. at 23, 36.) Plaintiff was represented by an attorney. (Tr. at 19.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that she was single and lived with her sixteen-year-old daughter. (Tr. at 23-24.) She had previously performed bookkeeping and payroll work and had also worked at the Visiting Nurses Association as a care-giver. (Tr. at 25-26.) During her work with patients, she developed a fear of germs which got worse when she started attending pharmacy school. (Tr. at 26.) Upon coming home from pharmacy school, she would take off all her clothes and put them in a bag, and she did not walk in the house with her shoes on. (*Id.*) Her family did not visit her because she cleaned too much. (*Id.*) At her last job, she had an impulse to clean everything in her office in the morning and after lunch, to the extent that she was told to bring her own cleaning supplies. (Tr. at 26-27.) She felt uncomfortable with her daughter walking barefoot on the floor or lying down with her. (Tr. at 27.) Because of her cleaning compulsion, she wore a scarf all the time, washed her hair constantly, and wore long sleeved shirts and jeans. (Tr. at 25.)

She testified that she had panic attacks at night and tried to practice the breathing patterns suggested by her psychiatrist to control the attacks. (Tr. at 27-28.) She also tossed and turned at night, had nightmares, and cleaned constantly – especially after people came to her house. (Tr. at 28.) She testified that she had anxiety attacks all day long; she either took Xanax, practiced the prescribed breathing pattern, or put a cold bottle of water on her wrist. (*Id.*) It usually took her thirty minutes to calm down. (*Id.*) During her depression, she did not like to be around anybody. (Tr. at 31.) She gained 15 to 20 pounds due to her depression and prescribed medications. (Tr. at 25.) Her medications were changed several different times dues to their side effects. (Tr. at 29.)

She had pain in the left side of her back and her knees. (Tr. at 29.) She sat upright and had to take breaks when cleaning because of her leg pain. (*Id.*) She had to lay down most of the time because she could not sit for extended periods. (*Id.*) She slept about four or five hours a day because she could not sleep at night. (*Id.*) She could not sit for more than twenty minutes at a time and could only stand for about fifteen minutes before needing to rest. (Tr. at 30.) She tried not to pick up anything heavier than a gallon of water and had difficulty bending because of her knee pain. (*Id.*) She did not drive because her medication made her drowsy. (Tr. at 28.) She went to the grocery store every other day, either early in the morning or late at night, but did not stay long. (Tr. at 32.)

### b. *Vocational Expert's Testimony*

The VE classified Plaintiff's past relevant work as a home health attendant (medium, semiskilled, SVP: 3), receptionist (sedentary, semi-skilled, SVP: 4), and tax clerk (sedentary, skilled, SVP: 5). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and work history who had no exertional limitations and could not have contact with the public as part of her job duties, but who retained the ability to have occasional contact with co-workers and

supervisors. (Tr. at 37.) The ALJ then asked the VE to opine the type of work such an individual could perform. (Tr. at 37-38). The VE testified that such an individual would be precluded from all of her past relevant work, but could perform other work existing in significant numbers in the economy. (*Id.*) The answer would be the same even if the contact with co-workers and supervisors was reduced to incidental. (Tr. at 38.) The tolerance for absenteeism would be one or two days a month; three days or more of absenteeism per month would preclude all competitive work. (*Id.*)

Upon cross-examination by Plaintiff's attorney, the VE testified that even if the hypothetical individual had a need to alternate sitting and standing at twenty-minute intervals and could only lift ten pounds, the entire sedentary unskilled occupational base would still be intact for her. (Tr. at 39-40.) However, if the hypothetical individual's attention and concentration were reduced to a level where she had lapses of attention and concentration up to one-third of an eight-hour workday, she would be precluded from all competitive work. (Tr. at 40.)

## C. **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on May 11, 2009. (Tr. at 9-18.) She found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 11, ¶2.) She also found that Plaintiff suffered from the severe impairments of depression, compulsive disorder, and substance abuse disorder, but she concluded that these impairments did not meet or medically equal a listed impairment. (Tr. at 11-12, ¶¶ 3, 4.) She found that Plaintiff had the RFC to sustain competitive work at all exertional levels limited by no contact with the public and occasional contact with co-workers and supervisors. (Tr. at 13.) She also found that Plaintiff was unable to perform her past relevant work as a tax clerk and home health attendant, but she maintained the RFC to perform other jobs that existed in significant numbers in the economy. (Tr. at 16, ¶¶ 5-9.) She concluded that Plaintiff had not been disabled since the

alleged onset date through the date of decision. (Tr. at 17, ¶ 10.)

D.  **Appeals Council Evidence**

After the ALJ's unfavorable decision, Plaintiff submitted additional evidence to the Appeals Council with her request for review. The evidence consisted of a detailed assessment of her work-related activities by Ikechukwu Robert Ofomata, M.D., a psychiatrist from Dallas Metrocare, and Zena Patel, a certified physician assistant. (Tr. at 515-17.) Plaintiff claims that Dr. Ofomata oversaw the treatment providers at Dallas Metrocare and took over her care when Dr. Reddy was transferred to another department in January 2009. (Pl. Br. at 6.)

Dr. Ofomata opined that Plaintiff had extreme loss of ability to perform the following activities in regular competitive employment and in a sheltered work setting: demonstrate reliability by maintaining regular attendance and punctuality with customary tolerances; perform at a consistence pace without an unreasonable number and length of rest periods/breaks; act appropriately with the general public; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; behave in an emotionally stable manner; respond appropriately to changes in a work setting; cope with normal work stress without exacerbating pathologically based symptoms; and finish a normal work week without interruptions from psychologically-based symptoms. (Tr. at 515-16.)

Dr. Ofomata affirmed Dr. Reddy's diagnosis of MDD, OCD, and anxiety disorder, and reported Plaintiff's manifestation of the following clinical signs during her treatment at Dallas Metrocare: crying spells, anhedonia, sleep disturbance, paranoia, low energy, chronic mood disturbance, racing thoughts, and chronic depression. (Tr. at 516.) He noted that Plaintiff had largely isolated herself in her home due to the severity of her OCD symptoms and depression and

had a residual disease process that had "resulted in such marginal adjustment that even a minimal increase in the mental demands or change in the environment would be predicted to cause [her] to decompensate." (Tr. at 517.) He anticipated that Plaintiff's impairments, symptoms, or treatment would cause her to be absent from work more than four days a month. (*Id.*) Her impairments were severe enough to produce these limitations regardless of any alcohol or drug abuse, and her mental disorder exacerbated her pain or fatigue so that she was less able to cope productively and was therefore more incapacitated by the physical impairments than might be anticipated from the objective anatomic findings alone. (*Id.*) He stated that even after two years of treatment at Dallas Metrocare, the extent of Plaintiff's limitations had not changed. (*Id.*) The Appeals Council included Dr. Ofomata's assessment in the record but denied Plaintiff's request for review. (Tr. at 1-4.)

## II. ANALYSIS

**A.     Legal Standards**

    **1.     Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

> 4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.
>
> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, and in the alternative, to remand for further proceedings. (P. Br. at 25.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.). The claimant must carry

"the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.** **Issue for Review**

Plaintiff presents the following issues for review:

(1) The Appeals Council must give full consideration to any new and material evidence submitted to it. Plaintiff submitted treating source opinion evidence that is directly at odds with the ALJ's major findings, yet the Council only provided a form denial. Is the Council's actions supported by substantial evidence?

(2) The Commissioner's RFC assessment must incorporate all limitations caused by all of claimant's medically determinable impairments. The ALJ overlooked numerous mental and physical limitations, failed to assign proper weight to each medical opinion, never consulted a medical expert, and relied on questionable evidence to discredit Plaintiff. Is the RFC finding supported by substantial evidence?

(Pl. Br. at 1.)

**C.** **Appeals Council's Evidence**

Plaintiff contends that the Appeals Council failed to follow its own policy and procedures for receipt of additional evidence. (Pl. Br. at 7-10.) She argues that the Council failed to accord proper weight to what was essentially an RFC assessment by her treating psychiatrist and provided no indication that it had actually evaluated the evidence. (*Id.* at 7-10.) She claims that proper consideration of the evidence might have led to a different disability determination. (*Id.* at 10.)

The regulations provide a claimant with an opportunity to submit new and material evidence to the Appeals Council for consideration in deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R. § 404.970(b). Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.

*Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 F. App'x. 279, 281-82 (5th Cir. 2006).

Here, the Appeals Council did not specifically address the additional evidence in reviewing the ALJ's decision. (Tr. at 1-2.) Even though an internal Appeals Council manual, the Hearings, Appeals and Litigation Law Manual ("HALLEX"), requires the Council to specifically address the additional evidence and legal arguments submitted in her request for review, the requirement has been temporarily suspended by a memorandum from the Executive Director of Appellate Operations, dated July 20, 1995. *See Newton v. Apfel*, 209 F.3d 448 (citing HALLEX §§ I-3-501); *Higginbotham*, 405 F.3d at 335 n.1.[3] The issue therefore is whether the new evidence diluted the record to such an extent that the ALJ's determination became insufficiently supported.

The ALJ's narrative discussion acknowledges that Plaintiff had consistently been assessed with a social, occupational, and psychological functioning (GAF) score of 45[4] by her treating sources at Dallas Metrocare, and that the score was indicative of serious symptomology. (Tr. at 15.) She relied, however, on Dr. Muirhead's psychological consultative examination results, which assessed a GAF score of 65[5] and noted that Plaintiff exhibited a sense of humor during the interview,

---

[3] There is no indication that the suspension has been lifted. *McGee v. Astrue*; 2009 WL 2841113, at *5 (W.D. La. Aug. 28, 2009).

[4] A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

[5] A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning. DSM-IV at 34.

laughed on several occasions, and had no difficulty remaining on topic, and that her thought processes were relevant and goal directed. (*Id.*) The ALJ also relied on Dr. Reddy's statement that Plaintiff's disability was not permanent and was expected to last six months or less, but she did not address Dr. Gutierrez's updated assessment that Plaintiff was unable to work at all due to her MDD and OCD, and that her disability, though not permanent, was expected to last more than six months. (*Id.*) The ALJ stated that there was evidence of active substance abuse by Plaintiff on a daily basis and found her testimony not credible. (Tr. at 15-16.)

Even if the ALJ's decision was initially supported by substantial evidence, the addition of Dr. Ofomata's assessment to the record makes her decision insufficiently supported. While treating sources from Dallas Metrocare assigned Plaintiff low GAF scores and opined that she was completely unable to work, they did not provide a detailed assessment of Plaintiff's inability to work. Dr. Ofomata's assessment, on the other hand is very detailed and addresses various aspects of her physical, social, and mental functioning. It not only identifies her limitations, but specifically points out that Plaintiff's impairments, symptoms, or treatment would cause her to be absent from work more than four days a month. (*Id.*) It also points out that her impairments are severe enough to produce the limitations regardless of any alcohol or drug abuse, and that the pain and fatigue related to her mental disorder, would incapacitate her more than might be anticipated from the objective anatomic findings alone. (*Id.*) Additionally, the assessment aligns with Plaintiff's testimony at the hearing, Dr. Reddy's and Dr. Gutierrez's opinions that Plaintiff was not able to work at all, and the low GAF scores Plaintiff was assigned at Dallas Metrocare. While Dr. Reddy opined that Plaintiff's disability would last six months or less, Dr. Gutierrez's updated assessment pointed out that it would last more than six months, and Dr. Ofomata's assessment noted that even

after two years of treatment at Dallas Metrocare, the extent of Plaintiff's limitations had not changed.[6]

In short, Dr. Ofomata's assessment dilutes the record to the point that the Commissioner's determination is insufficiently supported. Since the Appeals Council did not specifically address this evidence or any other conflicting evidence in the record, the case is remanded to the Commissioner for reconsideration. "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (citation omitted).

### III. CONCLUSION

*Plaintiff's Motion for Summary Judgment* is **GRANTED**, *Defendant's Motion for Summary Judgment* is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration.

**SO ORDERED, on this 31st day of July, 2010.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] The Commissioner argues that remand is not required because there is no evidence in the record that Dr. Ofomata actually examined Plaintiff. (Def. Br. at 12.) Dr. Ofomata's assessment itself indicates that it is based upon an examination of the Plaintiff. (*See* Tr. at 515.) In addition, Plaintiff notes that Dr. Ofomata oversaw other treatment providers at Dallas Metrocare and took over as her physician after Dr. Reddy was transferred to another department. (Pl. Br. at 6.) Even if Dr. Ofomata was not Plaintiff's treating physician, however, there is no requirement that the opinion at issue be that of a treating physician to serve as a basis for remand.